IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

EDGAR SHUN WILLIAMS,          )
                              )
            Plaintiff,        )
                              )   No. 11 C 8670
v.                            )
                              )   Magistrate Judge Sidney I. Schenkier
CAROLYN W. COLVIN,            )
Acting Commissioner of Social Security,[1] )
                              )
            Defendant.        )

## MEMORANDUM OPINION AND ORDER[2]

Plaintiff Edgar Williams moves for reversal or remand of the final decision of the Commissioner of Social Security ("Commissioner") denying his application for Supplemental Security Income benefits ("SSI") (doc. # 29). The Commissioner has filed a cross-motion seeking affirmance of the decision (doc. # 38). For the following reasons, we grant Mr. William's motion and remand the Commissioner's decision.

### I.

Mr. Williams applied for SSI in January 2008, alleging a disability onset date of September 21, 2007, when he was 38 years old (R. 136). After his claim was denied initially and upon reconsideration (R. 90-100), Mr. Williams received a hearing before an Administrative Law Judge ("ALJ") on April 19, 2010 (R. 46). The ALJ denied Mr. Williams's claim in May

---

[1] Pursuant to Federal Rule of Civil Procedure 25(d), we have substituted Acting Commissioner of Social Security Carolyn W. Colvin for Michael J. Astrue as the named defendant.

[2] On February 24, 2012 by consent of the parties and pursuant to 28 U.S.C. § 636(c) and Local Rule 73.1, this case was assigned to this Court for all proceedings, including entry of final judgment (doc. #10).

2010 (R. 18-27); in October 2011, the Appeals Council denied review of the ALJ's decision (R. 1). Subsequently, in March 2013, the Appeals Council set aside its original decision in order to consider additional evidence and then again denied review (R. 1-3), making the ALJ's ruling the final decision of the Commissioner. *See Shauger v. Astrue*, 675 F.3d 690, 695 (7th Cir. 2012).

## II.

We first summarize the administrative record. Part A reviews Mr. Williams's physical impairments, Part B reviews the hearing testimony and Part C summarizes the ALJ's opinion.

### A.

In December 2002, Mr. Williams injured his back while working as a laborer for the Bellwood, Illinois Streets and Sanitation Department (R. 52, 150-151). Between 2002 and his alleged disability onset date of September 21, 2007, Mr. Williams did not work at all (R. 15).[3] During these years, he visited the Melrose Park Health Clinic ("Melrose Park Clinic") four to six times each year for various reasons, including low back pain and high blood pressure (R. 292-332).[4] Mr. Williams was prescribed Tarka for his high blood pressure and Ibuprofen and Vicodin for his pain; he has taken Vicodin nearly every day since soon after his injury (R. 59).

Mr. Williams's medical treatment relevant to our decision began in April 2007, when he again visited the Melrose Park Clinic complaining of back pain (R. 302). At that time, he had an

---

[3] The record shows that Mr. Williams earlier applied for SSI and Title II Disability Insurance Benefits ("DIB") in April 2005, alleging that he had degenerative disc disease and obesity with an onset date in March 2005 (R. 37-45). The ALJ denied Mr. Williams's request for benefits on September 15, 2007 (R. 33); the current application for SSI alleges a new onset date of September 21, 2007 (R. 136).

[4] Relevant clinic visits occurred on February 24, 2003, July 29, 2003, September 21, 2004, February 8, 2005, May 28, 2005, July 24, 2005, and March 8, 2006 for low back pain and refills of his pain medications (R. 310, 314-16, 320, 331). He also visited the clinic every two to three months for blood pressure checks and refills of his blood pressure medication (R. 307-8, 310, 313, 317, 327, 329-30).

X-ray which showed a narrowing of the lumbosacral spine at L5-S1 (R. 301).[5] In July 2007, Mr. Williams had an MRI of his lower back. The MRI showed diffuse epidural lipomatosis, or an overgrowth of fat inside the vertebrae, between L2 and S2 (R. 243). It also showed degenerative disc disease at L4/L5 and L5/S1 and mild facet arthropathy, which refers to the development of arthritis in the vertebrae's facet joints (*Id.*). The MRI revealed no spinal canal stenosis or other major issues at L5/S1. The remainder of Mr. Williams's spine was unremarkable (*Id.*).

After Mr. Williams had his MRI, the record does not reflect any change to his treatment program. He visited the Melrose Park Clinic twice in January 2008 complaining of back pain and continued to take Vicodin and Ibuprofen as needed (R. 293-94). Also in January 2008, Mr. Williams's treating physician, Joseph Giacchino, wrote a letter to Mr. Williams's attorney giving the opinion that Mr. Williams was totally disabled and had no ability to perform any type of work (R. 185). The letter said that Mr. Williams's disability was permanent and also said that his "rehabilitation potential is fair" (*Id.*).

Mr. Williams underwent a consultative examination by Dilip Patel, M.D., a state agency physician, on March 24, 2008 (R. 284-87). Dr. Patel noted in his report that Mr. Williams was unable to walk heel-to-toe, squat, or get on or off the exam table (R. 287). He also had a positive "straight leg raise" test which meant he could not lift either leg up to a 45 degree angle without pain (*Id.*). Dr. Patel diagnosed Mr. Williams with lumbosacral disk disease and high blood pressure (*Id.*); he did not express any opinion on Mr. Williams's capacity to perform work-related activity.[6]

---

[5] The spine has four regions – seven cervical or neck vertebrae, 12 thoracic or upper back vertebrae, five lumbar or lower back vertebrae and the sacrum and coccyx, which are bones fused together at the base of the spine. An L5-S1 narrowing refers to the space inside the lowest lumbar vertebra and the top sacral vertebra. http://www.ninds.nih.gov/disorders/backpain/detail_backpain.htm (visited on September 3, 2014).

[6] The parties do not dispute Mr. Williams's diagnosis of high blood pressure, but this impairment does not seem to be a relevant factor in any of the analyses of his residual functional capacity or what types of jobs he is or is

On April 29, 2008, Commission physician Virgilio Pilapil, M.D. reviewed Dr. Patel's report, as well as the x-ray and MRI reports, before completing a Residual Functional Capacity ("RFC") Assessment for Mr. Williams (R. 347-58). Dr. Pilapil opined that Mr. Williams could frequently lift ten pounds, occasionally lift 20 pounds, could stand and/or walk for at least two hours in an eight hour day, and could sit for about six hours per day (R. 348). He agreed with Dr. Patel's diagnosis of lumbosacral disc disease with radiculopathy (nerve damage) symptoms and high blood pressure (R. 354). The "comments" section of the RFC noted that Mr. Williams experienced a lot of pain when bending or stretching, that he required frequent rest periods and that either prolonged standing or sitting increased his symptoms (*Id.*).

On September 12, 2008, Mr. Williams visited the Melrose Park Clinic to report increased back pain that was spreading to his right leg (R. 371). On November 5, 2008, Mr. Williams's treating physician from the Melrose Park Clinic, Dr. Giacchino, completed a "multiple impairment questionnaire" that diagnosed Mr. Williams with lumbar osteoarthritic disc disease with right leg weakness (R. 360). Dr. Giacchino opined that Mr. Williams could sit for three hours and stand or walk for two hours in an eight hour work day, and stated that Mr. Williams could not sit continuously but must get up and move around once every hour for 15 minutes (R. 362). He was also able to occasionally lift or carry up to ten pounds (*Id.*). Dr. Giacchino wrote that Mr. Williams had constant pain and that he would be absent from work more than three times per month because of it (R. 366).

Mr. Williams continued to visit Dr. Giacchino at the Melrose Park Clinic in 2008 and 2009 because of back pain (R. 371, 375, 377-78). In May 2009, he visited the clinic to report that his right knee "'gives out on him' with pain that radiates down Rt lower extremity" (R. 377). In

---

not able to perform. Mr. Williams does not contend that his high blood pressure is at least part of the reason he is unable to work and so we do not address the issue further.

July 2009, Mr. Williams had another x-ray of his spine which showed mild degenerative spurring of the L5 but no other issues (R. 379). In January 2010, Dr. Giacchino wrote a letter confirming the opinions in his earlier RFC from 2008 (R. 383).

## B.

At the hearing, Mr. Williams testified that he spent the majority of his days reading and watching television, often with his right leg or both legs elevated to alleviate pain (R. 55- 56, 73). He stated that he could walk for about 20 minutes before needing to sit down and sit for about thirty minutes before needing to get up to move around, and that he could lift 20-25 pounds (R. 56).[7] He also told the ALJ that he could tie his shoes "a little," that he had trouble with balance and falling because his right leg would give out and that problem would prevent him from working at a job that allowed him to alternate sitting and standing (R. 57, 71). Mr. Williams testified that he needed to take unscheduled breaks to take medicine whenever he experienced pain (R. 73), and at least twice a month he was unable to get out of bed because of the pain (R. 74). The longest Mr. Williams could remember standing without taking a break was for 30 minutes to talk to his mother (R. 69).

At the hearing a vocational expert ("VE") also testified. The ALJ gave him the following hypothetical to consider: a person of Mr. Williams's age, education, work experience, and skill set who is able to lift up to 20 pounds occasionally, lift or carry up to ten pounds frequently, stand for up to two hours in an eight hour workday, and sit for up to eight hours in an eight hour workday with normal breaks. Given that hypothetical, the VE testified that Mr. Williams's limitations would make him unable to resume his past job as a worker for the Bellwood Street Department (R. 78-79). Instead, Mr. Williams would be limited to unskilled, sedentary

---

[7] Mr. Williams's testimony that he could lift "twenty-five/twenty pounds" was in response to the ALJ's question, "How much can you lift?" (R. 56). The ALJ did not qualify the question by asking how frequently Mr. Williams could lift that weight or how long he could hold the weight before having to put it down.

occupations. Examples of such jobs in the Chicago area included eyeglass assembly (2,000 jobs), sorter (10,000 jobs) and printed circuit board assembly (6,000 jobs), among others (R. 79).

When the ALJ altered several factors in the hypothetical, the VE testified that his answer regarding available jobs would not change if the hypothetical individual was limited to only simple, repetitive tasks, could have only occasional interaction with the public or co-workers, had to sit or stand alternatively at will without being off task more than 10 percent of the time and was limited to lifting only ten pounds occasionally (R. 80). Next, the ALJ asked if a person who was unable to engage and sustain work activity on a regular and continuing basis for eight hours a day, five days a week would be able to hold a full-time job at any exertion level. The VE replied that such a person would not be employable (R. 81). The VE also testified that "typical" breaks in an eight-hour work day would be a single 15 minute break in the morning and a 30 or 60 minute lunch break (*Id.*). He stated that a person who took unscheduled breaks for any reason would be considered unemployable (*Id.*).

## C.

On May 19, 2010, the ALJ issued a written opinion finding Mr. Williams not disabled (R. 18-27). In evaluating Mr. Williams's claim, the ALJ applied the familiar five-step sequential inquiry for determining disability, which required him to analyze whether the claimant: (1) is currently employed; (2) has a severe impairment; (3) has an impairment that meets or equals one of the listed impairments in 20 C.F.R. § 404, Subpart P, Appendix 1; (4) can perform his past work; and (5) is capable of performing other work in the national economy. *See* 20 C.F.R. §404.1520(a)(4); *Kastner v. Astrue*, 697 F.3d 642, 646 (7th Cir. 2012).

At Step 1, the ALJ found Mr. Williams had not engaged in substantial gainful employment since January 8, 2008, the date of his application for benefits (R. 20). At Step 2, he

found that Mr. Williams had the severe impairments of degenerative disc disease and hypertension (*Id.*).

At Step 3, the ALJ ruled that there were no clinical signs or findings that Mr. Williams had an impairment that met or medically equaled the severity of any listed impairment, including Listings 1.04 (disorders of the spine) or 4.00 (cardiovascular) (R. 22). The ALJ then determined that Mr. Williams had an RFC to:

> Perform sedentary work as defined in 20 CFR § 416.967(a) with limitations: The claimant can lift no more than a maximum of 20 pounds occasionally and lift and carry up to 10 pounds frequently, stand/walk for a total of no more than 2 hours in a normal 8-hour workday, and sit for a total of 8 hours in an normal 8-hour workday subject to postural limitations of never climbing ladders, ropes or scaffolds, occasionally climbing ramps or stairs, never crawling, and occasionally balancing, stooping, crouching, or kneeling (*Id.*).

In determining Mr. Williams's RFC, the ALJ first found that Mr. Williams's testimony about his pain and symptoms was not persuasive because, in the view of the ALJ, Mr. Williams's allegation of disability rested primarily on his testimony about a history of back pain (R. 24).[8] The ALJ also noted that Mr. Williams testified that he experienced back spasms with associated leg weakness after sitting or standing for too long, but that the treatment record did not reflect such a complaint (*Id.*)

In assessing Mr. Williams's credibility as to his complaints of pain and ability to work, the ALJ found Mr. Williams's testimony to be both internally inconsistent and contradicted by other evidence in the record, particularly with respect to two Function Reports Mr. Williams's

---

[8] The ALJ also found Mr. Williams to be not credible because he testified that he had stopped taking the anti-depressant Paxil because it made him suicidal but later testified that it made him jittery, and also because he testified several times that he could not work because he had a problem "with people," but stated that he got along with people he had worked with in the past (R. 24). As Mr. Williams has not disputed the ALJ's finding that he did not suffer from a severe mental impairment, we do not further address these statements or how they bear on Mr. Williams's credibility about his physical pain.

7

completed in 2008. Specifically, the ALJ questioned Mr. Williams's credibility because (1) at the hearing, he testified that he watches two to three hours of television and reads novels, which the ALJ said contradicted his doctor's opinion that Mr. Williams's pain would interfere with his ability to maintain concentration and attention; (2) he testified that he experienced back spasms and sitting or standing too long with associated leg weakness but there is no documentation of such complaints in the record;[9] (3) he testified that he did no household chores but did not explain why; (4) he testified that he could tie his shoes but wrote in a Function Report dated February 6, 2008 that it was too painful to bend over to do chores (R. 176-83); and (5) in that same Function Report he wrote that he could stand long enough to microwave food and also that he stood for a few minutes to load the dishwasher (*Id*).

With respect to opinion evidence, the ALJ gave little weight to the RFC analysis prepared by the medical consultant for the State because the evidence adduced at the hearing showed that Mr. Williams was more limited than the consultant had determined (R. 24). The ALJ did not describe how Mr. Williams was more limited than the agency doctor's RFC. He also did not explain what, if any, weight he gave the consultative examiner or his report upon which the state medical consultant relied for his RFC opinion.

The ALJ also gave no weight to Mr. Williams's treating physician, Dr. Giacchino. In deciding to discount the doctor's opinion, the ALJ found that the doctor's January 2008 letter was internally contradictory because it stated both that Mr. Williams's status was "of total

---

[9] We note that Mr. Williams's treatment record does reflect that he reported pain radiating from his lower back into his right leg and knee at his May 2009 visit to the Melrose Park Clinic. Also, in the Physical Assessment Questionnaire he completed in August 2008, Mr. Williams reported that he cannot sit or stand in one place for too long and that he needs to get up and walk because of the pain (R. 216). In another questionnaire he completed in February 2008, Mr. Williams stated that he can only stand long enough to microwave a meal (R. 178). Additionally, Dr. Patel diagnosed Mr. Williams with radiculopathy and Dr. Pilapil's assessment includes a discussion of the fact that Mr. Williams reported that his pain and symptoms increase when he sits or stands for too long (R. 354).

disability to perform work of any type" and that it was "permanent and likely to last indefinitely," but then later opined that Mr. Williams's rehabilitation potential was "fair" (R. 25).

Next, the ALJ discounted Dr. Giacchino's RFC analysis because the doctor limited Mr. Williams to lifting up to five pounds frequently and ten pounds occasionally while Mr. Williams testified at the hearing that he could lift 20-25 pounds (R. 25). Further, Dr. Giacchino's RFC limited Mr. Williams standing and/or walking for two hours and sitting for three hours while Mr. Williams testified that he could walk for no more than 20 minutes, stand for two hours and sit for 30 minutes at a time (*Id.*). Finally, the ALJ stated that he found no documentation in the treatment records as to the nature and intensity of Mr. Williams's pain or on what Dr. Giacchino based his opinions about Mr. Williams's pain (*Id.*).

### III.

We review the ALJ's decision deferentially, and will affirm if it is supported by substantial evidence. *Thomas v. Colvin*, 745 F.3d 802, 806 (7th Cir. 2014). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pepper v. Colvin*, 712 F.3d 351, 361-62 (7th Cir. 2013) (quoting *McKinzey v. Astrue*, 641 F.3d 884, 889 (7th Cir. 2011) (internal citations omitted). We do not reweigh evidence or substitute our own judgment for that of the ALJ. *Shideler v. Astrue*, 688 F.3d 306, 310 (7th Cir. 2012). In rendering a decision, the ALJ "must build a logical bridge from the evidence to his conclusion, but he need not provide a complete written evaluation of every piece of testimony and evidence." *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005).

Our focus in this case is on the steps the ALJ took to determine Mr. Williams's RFC and whether the ALJ built a "logical bridge" from the record evidence to this determination. To develop a claimant's RFC, an ALJ must evaluate all limitations that arise from medically

determinable impairments, even those that are not severe, and may not dismiss a line of evidence contrary to the ruling. S.S.R. 96–8p; *Golembiewski v. Barnhart*, 322 F.3d 912, 917 (7th Cir.2003).

Mr. Williams contends that the ALJ made two errors when he considered the evidence of Mr. Williams's limitations: (1) the ALJ failed to follow the "treating physician rule" with respect to Dr. Giacchino and (2) the ALJ erred in his assessment of Mr. Williams's credibility. We will address these arguments in turn.

### A.

"The opinion of a treating doctor generally is entitled to controlling weight if it is consistent with the record, and in any event cannot be rejected without a 'sound explanation.'" *Sambrooks v. Colvin*, No. 13 C 2529, -- Fed.Appx. --, 2014 WL 2700119, at *4 (7th Cir. June 16, 2014), (quoting *Jelinek v. Astrue*, 662 F.3d 805, 811 (7th Cir. 2011)). An ALJ may give less weight or reject a treating physician's opinion if that opinion is not supported by medically acceptable objective findings, if it is internally inconsistent or inconsistent with other substantial evidence or are merely conclusory statements. *See*, 20 C.F.R. §§ 404.1527(d)(2)(i)-(ii), (3)-(5), 416.927(d)(2)(i)-(ii).

If the ALJ does not give a treating physician's opinion controlling weight, he must give a sound reason for rejecting it. *See, Walgren v. Colvin*, 12 C 6378, 2013 WL 4659565 (N.D. Ill. Aug. 29, 2013). "Moreover, '[e]ven if an ALJ gives good reasons for not giving controlling weight to a treating physician's opinion, [ ]he has to decide what weight to give that opinion,' considering 'the length, nature, and extent of the treatment relationship, frequency of examination, the physician's specialty, the types of tests performed, and the consistency and

support for the physician's opinion.' " *Wood v. Astrue,* No. 12 C 3515, 2013 WL 1154461, at *7 (N.D.Ill. Mar. 18, 2013) (quoting *Campbell v. Astrue,* 627 F.3d 299, 308 (7th Cir.2010)).

In this case, the ALJ did not discuss Dr. Giacchino's long and regular history of treating Mr. Williams, the medical evidence and diagnostic tests that Dr. Giacchino used to help form his opinions, and the fact that it was Dr. Giacchino who consistently prescribed Mr. Williams's pain medications after his regular visits to the Melrose Park Clinic. Most significantly, the ALJ points to nothing in the medical record that contradicts Dr. Giacchino's diagnosis that Mr. Williams suffered from degenerative disc disease and experienced almost daily pain and physical limitations that would prevent him from holding a full-time job. The MRI and two x-rays all show degeneration in various sections of Mr. Williams's lumbar spine. The consultative physician who examined Mr. Williams also diagnosed him with degenerative disc disease and noted that Mr. Williams was unable to get on or off the exam table perform other simple tests designed to assess his impairment. The Commissioner's doctor, who also completed an RFC, confirmed the diagnosis of degenerative disc disease and also opined that Mr. Williams was unable to sit for more than six hours in an eight hour workday – an assessment that the ALJ actually found did not fully address all of Mr. Williams's limitations. In the absence of any medical evidence to the contrary, we cannot determine how the ALJ decided that Dr. Giacchino's medical opinion was entitled to no weight.

The ALJ focused on contradictions in Dr. Giacchino's opinions in deciding to discount these opinions completely (R. 25). However, the ALJ's statements do not show that Dr. Giacchino's medical opinions were either internally inconsistent or contradicted by Mr. Williams's testimony about his abilities.

11

Dr. Giacchino's statement in his January 22, 2008 report that Mr. Williams's rehabilitation potential was "fair" does not, on its own, suggest that he was actually able to work or otherwise call into question Dr. Giacchino's overall assessment of Mr. Williams. A "fair" potential for rehabilitation does not mean that Mr. Williams had, in fact, achieved rehabilitation in January 2008; or that he ever achieved it; or that his maximum rehabilitation equated to an ability to perform full time work. Indeed, the fact that Dr. Giacchino's later assessments continued to ascribe to Mr. Williams's physical limitations inconsistent with work suggests that Dr. Giacchino's opinion was that Mr. Williams had not rehabilitated sufficiently to be able to work. That said, to the extent that Dr. Giacchino's reference to Mr. Williams's rehabilitation potential raised an ambiguity to the ALJ about Mr. Williams's condition, the ALJ should have sought clarification from Dr. Giacchino rather than simply indulge the assumption most adverse to Mr. Williams.

Moreover, the ALJ's attempt to discredit Dr. Giacchino's opinions on the ground that Mr. Williams's testimony contradicted them falls flat. Although Mr. Williams and Dr. Giacchino (along with Dr. Pilapil) all had somewhat different positions on exactly how much and for how long Mr. Williams could lift, carry, sit and stand, they were all consistent in the position – contrary to the ALJ's RFC – that Mr. Williams was not able to spend an entire eight hour day in a sitting position and that he would need multiple unscheduled breaks to move around or change postures. The ALJ points to no evidence on which he bases his conclusion that Dr. Giacchino's opinion deserved to be completely discounted because it was contradicted by Mr. Williams's testimony.[10]

---

[10] We also find that – contrary to the ALJ's position – the record does reflect documentation of Mr. Williams's pain and Dr. Giacchino's awareness of it. It was Dr. Giacchino who regularly saw Mr. Williams at the Melrose Park Clinic to treat his complaints of back pain and it was also Dr. Giacchino who prescribed Mr. Williams's pain medications. Further, the record reflects that Mr. Williams's pain was noted and documented by Dr.

12

After discounting the treating doctor's opinion, the ALJ next briefly discussed the only other medical opinion in the case, that of the state agency physician Dr. Pilapil. The ALJ gave little weight to Dr. Pilapil's decision on the ground that "evidence added at the hearing level shows that the claimant is more limited than the consultant had determined" (R. 24). However, the ALJ does not specify which parts of the RFC he believes are inconsistent with Mr. Williams's abilities. More importantly, he also does not reconcile the fact that this supposedly "too optimistic" RFC still limits Mr. Williams to sitting for only six hours in an eight hour day and yet the ALJ's RFC finds that Mr. Williams can sit for eight hours in an eight hour day.[11]

An ALJ may reject all medical opinions in the record when none of the doctors provide medically acceptable evidence to support their positions. *See* 20 C.F.R. § 404.1526, 416.926, *May v. Apfel*, 98-1647, 1999 WL 1011927 (N.D.Ill. Sept. 30, 1999). But in such a case, the ALJ may not substitute his own medical opinion for that of the claimant's physicians when determining the RFC. *See Scivally v. Sullivan, M.D.*, 966 F.2d. 1070, 1077 (7th Cir. 1992). In *Scivally*, the ALJ erred when he rejected the findings of a number of physicians that the claimant's limitations were more severe than the ALJ determined, but did not cite to any medical evidence to support his conclusions. The appeals court held that in the absence of contradictory evidence about the claimant's abilities, the ALJ could not substitute his own medical judgment to determine her RFC. *Id.*

We have a similar situation in this case. After rejecting all of the medical opinions, the ALJ determined an RFC for Mr. Williams's that contradicted those opinions without referring to

---

Patel when he examined Mr. Williams, ultimately diagnosing him with nerve damage along with his other back impairments.

[11] Although it may seem counter-intuitive, we note that in Mr. Williams's situation, a job that requires the ability sit for a full 8 hours in an 8 hour workday (with normal breaks) should be assessed as more difficult with respect to his physical limitations than a job that requires the ability to sit for 6 hours in an 8 hour workday.

13

any other supporting medical evidence. If the ALJ has insufficient evidence to reach a conclusion, he has an obligation to more fully develop the record by "requesting additional existing records, re-contacting medical sources, asking the claimant for more information or asking the claimant to undergo a consultative examination." *Collins v. Barnhart*, 533 F.Supp.2d 809, 820 (N.D. Ill. 2008) *citing Luna v. Shalala*, 22 F.3d 687, 693 (7th Cir. 1994). The ALJ failed to take any of these steps and instead substituted his own medical opinion regarding Mr. Williams's RFC. For this reason alone, we remand the case.

### B.

We will also briefly address errors in the ALJ's analysis of Mr. Williams's credibility. While we review an ALJ's credibility determination deferentially and uphold it unless it is "patently wrong," *Eichstadt v. Astrue*, 534 F.3d 663, 668 (7th Cir. 2008), the ALJ still must "build an accurate and logical bridge between the evidence and the result." *Shramek v. Apfel*, 226 F.3d 809, 811 (7th Cir. 2000) (internal citations omitted). The regulations emphasize how important it is for the ALJ to explain the reasons for his credibility finding. *Reid v. Astrue*, No. 09 C 6906, 2011 WL 1485276 at *10 (N.D. Ill. April 19, 2011).

To assess credibility, the ALJ must consider the claimant's statements about symptoms and how they affect his daily life and ability to work. *Shideler*, 688 F.3d at 310–11. Subjective allegations of disabling symptoms alone cannot support a finding of disability. *Id.* When determining disability, the ALJ must weigh the subjective complaints, the relevant objective medical evidence, and any other evidence of the following factors: (1) the individual's daily activities; (2) the location, duration, frequency, and intensity of pain or other symptoms; (3) any precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medication; (5) treatment, other than medication, for relief of pain or other symptoms; (6) other

measures taken to relieve pain or other symptoms; and (7) other factors concerning functional limitations due to pain or other symptoms. *See* 20 C.F.R. § 416.929(c)(3).

In finding that Mr. Williams was not credible with respect to his pain and limitations, the ALJ did not discuss Mr. Williams's long history of taking powerful medication, his regular visits to the Melrose Park Clinic for back pain and medication management or the fact that he participated in almost no daily household activities. Instead, the ALJ relied on a single notation in a Function Report that Mr. Williams loaded his dishwasher at home[12] and also could stand long enough to microwave a meal despite also reporting that he did no household chores because of his pain. The ALJ also discounted Mr. Williams's credibility because he didn't complain that his pain prevented him from paying attention to books or television. We find any arguable inconsistency to be at most *de minimus* – and more likely non-existent.

That Mr. Williams occasionally loaded the dishwasher does not negate his allegations of pain or limitation, particularly because his testimony and Function Reports consistently show that he spent the majority of his days sitting with his leg raised to watch television and getting up to move around when his back pain got severe. Neither does Mr. Williams's ability to watch television or read books contradict Dr. Giacchino's assessment that Mr. Williams's pain would prevent him from being able to concentrate or pay attention to tasks. Even assuming that Mr. Williams was able to concentrate on a television program or pay attention to a book despite his pain, there is no evidence that such activities translate into the ability to maintain attention or concentration during full time work. While an ALJ may consider a claimant's daily activities when assessing his alleged symptoms, 20 C.F.R. § 404.1529, "[w]e have cautioned the Social Security Administration against placing undue weight on a claimant's household activities in

---

[12] At the hearing, the ALJ asked Mr. Williams if he ever loaded or unloaded the dishwasher. Mr. Williams responded "she mostly. I don't.", with the "she" referring to his mother (R. 54).

assessing the claimant's ability to hold a job outside the home." *Mendez v. Barnhart*, 439 F.3d 360, 362 (7th Cir.2006). Here, the ALJ gives no explanation as to how the fact of Mr. Williams's television-watching habit casts doubt on his credibility about his ability to work full time.

As we note above, the ALJ wrote that Mr. Williams never reported back spasms and associated leg weakness after sitting or standing for too long. However, the record is replete with evidence that Mr. Williams complained of back pain radiating down to his right leg and that he reported not being able to sit or stand for too long without experiencing additional back pain.

Absent a full analysis of the factors needed to make a credibility analysis, and because there is no true conflict between Mr. Williams's testimony and the medical evidence, upon remand the ALJ should also reassess his determination of Mr. Williams's credibility with respect to his pain and limitations.

## CONCLUSION

For the reasons stated above, we grant Mr. Williams's motion to remand the ALJ's decision (doc. #29) and we deny the Commissioner's motion to affirm the denial of benefits (doc. # 38). We also reject Mr. Williams's alternative request for a reversal and an award of benefits; we are not prepared to say that Mr. Williams must inevitably be found disabled. We leave that determination in the first instance to the ALJ on remand. This case is remanded for further proceedings consistent with this ruling. The case is terminated.

**ENTER:**

*[signature]*

**SIDNEY I. SCHENKIER**
**United States Magistrate Judge**

**DATED: September 24, 2014**